1
2
3
4
5
6
7
8

# UNITED STATES DISTRICT COURT

9

## EASTERN DISTRICT OF CALIFORNIA

10

| | |
|---|---|
| CARLOTTA OGUNDIMO, | 1:09-cv-00230 GSA |
| Plaintiff, | ORDER REGARDING PLAINTIFF'S SOCIAL SECURITY COMPLAINT |
| v. | |
| MICHAEL J. ASTRUE, Commissioner of Social Security, | |
| Defendant. | |

11
12
13
14
15
16
17
18
19

## **BACKGROUND**

20

Plaintiff Carlotta Ogundimo ("Plaintiff") seeks judicial review of a final decision of the

21 Commissioner of Social Security ("Commissioner" or "Defendant") denying her application for

22 supplemental security income benefits pursuant to Title XVI of the Social Security Act.  The

23 matter is currently before the Court on the parties' briefs, which were submitted, without oral

24 argument, to the Honorable Gary S. Austin, United States Magistrate Judge.[1]

25
26
27
28

[1] The parties consented to the jurisdiction of the United States Magistrate Judge.  *See* Docs. 9 & 17.

## FACTS AND PRIOR PROCEEDINGS[2]

Plaintiff protectively filed an application for supplemental security income benefits on September 24, 2004, alleging disability beginning September 24, 2003.  AR 425-427.  Her application was denied initially and on reconsideration, and Plaintiff requested a hearing before an Administrative Law Judge ("ALJ").  AR 400-404, 407-411, 413-415.  ALJ Christopher Larsen held a hearing on August 13, 2008, and issued an order regarding benefits on September 15, 2008, finding Plaintiff was not disabled.  AR 19-25.  On January 9, 2009, the Appeals Council denied review.  AR 11-14.

### 2008 Hearing Testimony

ALJ Larsen held a hearing on August 13, 2008, in Fresno, California.  Plaintiff appeared and testified, as did her daughter Fatima Ogundimo.  Plaintiff was not represented by counsel.  Vocational Expert ("VE") Thomas Dachelet also testified.  AR 734-774.

When asked to summarize all of the reasons why Plaintiff believes she is unable to work, she indicated that when she gets up in the morning she is nauseated and feels sick to her stomach.  She has shooting pains in her back, down her legs and through her back.  AR 748-749.  She also suffers from headaches that affect her vision.  Additionally, Plaintiff indicated that she falls a lot because she is not stable.  AR 749.

Plaintiff uses a wheelchair because she injured her back at work.  She indicated that doctors told her that her back was fine and she could return to work, however, her back became swollen and "very hot."  Doctors suggested it may be a hairline fracture and recommended muscle relaxers and painkillers.  In the nearly nine years since the back injury, Plaintiff's condition has worsened.  AR 749-750.  Plaintiff later explained that the incident causing her back injury involved her attempting to move a patient who weighed about 450 to 475 pounds, without the assistance of any mechanical equipment.  AR 773.  Plaintiff indicated it was not common for her to have to move a patient in those circumstances, but when she began her shift the woman

---

[2] References to the Administrative Record will be designated as "AR," followed by the appropriate page number.

was covered in feces, "from her head to her toe," and she was crying.  The woman was not

Plaintiff's patient, but she felt sorry for the woman so she tried to help.  AR 774.

When asked about her comment that she could possibly work from home, Plaintiff

explained others have told her perhaps she could work from home via the internet.  AR 751.

While she cannot use an ordinary desk chair, she believed she could pull her wheelchair up to the

desk or kitchen table.  AR 752.  She does not know what type of specific job one could do on a

computer because her previous work involved working in an office or hospital setting.  AR 752.

Plaintiff indicated she can look up information on the computer and uses it to read the news.  She

believes that four hours a day, or twenty hours a week, "would probably be a lot for" her because

it would become too painful to sit in the chair "after so many hours."  AR 752.  Her leg and foot

would become numb.  AR 752-753.

Asked how long she spends in the wheelchair during the day, Plaintiff said that after two

hours it becomes painful.  If she is at home, she can avoid having to use it altogether because she

is "not up on" her feet a lot.  AR 753.  She began using the wheelchair in 2002 after a neurologist

"wrote out an order" and a Dakota Sports evaluation also advised the use of a wheelchair because

her "walking gait is . . . dangerous."  AR 753-754.  Additionally, Dr. Curry advised her following

an x-ray that something was causing her "legs to become weak."  AR 754.

When she gets up in the morning, Plaintiff tries to take her shower and brush her teeth.

Depending upon how her arms feel that day, she may comb her hair.  AR 754.  She does not eat

breakfast every day because she does not feel well enough to cook it every day.  She tries to grab

something simple, "mostly finger food."  She does force herself to fix the children something to

eat if they are hungry.  AR 754.  Plaintiff does try to cook dinner, however, she has "no activities

between breakfast and dinner."  The majority of her day is spent sitting and resting because she is

too tired.  She may try to do a load of laundry, however, her daughters do most of the cleaning.

AR 754-755.  If she tries to clean her own bathroom, she becomes "very exerted" and has to sit

on the toilet with a long brush to clean the tub, for example.  AR 755.

1      Between breakfast and dinner, Plaintiff sleeps on and off due to the pain because "the

2 pain exerts" her and if she takes pain medication it makes her tired.  She falls asleep about three

3 times during that time period.  AR 755.

4      Plaintiff is currently seeing Dr. Conanan about every three months or so.  She misses

5 winter appointments because it is too cold for her, and she has missed a summer appointment due

6 to the heat.  In the winter, her legs become cold and she "got frostbitten" so she does not go out

7 for the appointments.  AR 755-756.

8      Asked about a Social Security referral to a psychologist for an examination that Plaintiff

9 failed to attend, she explained that someone sent her a letter that told her not to go.  She was told

10 to see Dr. Damania, and "went there several times."  A week or so later, she received a letter

11 advising her not to attend the appointment.  She believes that letter was sent by a "Mr.

12 Edamons."  AR 756-757.

13      In 1993, Plaintiff worked in the childcare field and as a certified nurse assistant.  In the

14 previous fifteen years, she also worked in an office performing accounts payable and receivable

15 type work.  Asked the name of the company she worked for, Plaintiff indicated it was "a mother

16 company," or "base company."  She explained it was "like TruValue," with " a hundred million

17 different TruValues" but one mother company.  She worked for "the mother company in

18 accounting."  She believes the name of the company was "Carter and Company."  AR 758-759.

19 The position involved dealing with clients, using an adding machine, and answering questions

20 about client accounts.  AR 759-761.  She did that for about four years.  AR 761.  Despite the

21 office work, Plaintiff's heart was in nursing.  Before she hurt her back, Plaintiff was in a

22 registered nursing program, and hoped to eventually earn a master's degree.  AR 761.

23      Plaintiff is a high school graduate with a couple years of college education.  AR 762.  She

24 has a "license to do hair," and certificates in accounting and switch boarding.  The accounting

25 certificate was earned from Peters Cortez Business School, when she was about eighteen years

26 old. AR762-763.  Neither her cosmetology license nor any other license is current because no

27 one "will let [her] work in [her] condition."  AR 763.  For example, were she dressing hair, the

28 type of hair she works with is mostly African-American hair that has to be heated to style.

1  Because she suffers from carpal tunnel syndrome, she "would drop a curling iron on" a client.

2  AR 763.

3          Fatima Ogundimo, Plaintiff's fifteen year old daughter, also testified.  AR 766.  Fatima

4  indicated that her mother gets "really sick sometimes."  She can only walk for a little while

5  before she has to lie down.  She cooks occasionally and cleans a little bit.  Asked what a "little

6  while" means, Fatima explained her mother can walk for "probably five, ten minutes" at a time.

7  If she is standing up cooking, Plaintiff can stand for the length of time "it takes to cook," before

8  she needs to rest.  AR 767.  Fatima believes her mother started using the wheelchair in 2001, and

9  she always uses the wheelchair when she leaves the house.  AR 767-768.

10         Plaintiff and Fatima indicated that staff from the Department of Health and Human

11  Services previously indicated to Plaintiff that she did not need in-home care services, and that her

12  children - who were then as young as two and as old as twelve - could help her.  AR 768-769.

13         Plaintiff asked her daughter to tell the judge what she (Fatima) does on a weekly basis in

14  the household.  Fatima replied as follows:

15              WTN: Let's see, every day you got to clean the bathroom, the kitchen, our
              rooms, sweep and mop the dining room, let's see, clean the mirrors in the
16              bathroom, the tub, the toilet, the floors, polish, clean up the walls, the cabinets,
              what it's called, baseboards, walk to the store, do that about three or four times a
17              day, I mean, a week, three or four times a week.
              CLMT: What do you, do the store for grocery shopping.
18              WTN: Yeah, and, and you know, you got to run errands.  Sometimes you
              got to get on the bus to go pay our bills.  Let's see.
19              ALJ: Okay.
              CLMT: And laundry.
20              WTN: Laundry too.
              ALJ: Okay.
21

22  AR 769-770.

23         With regard to Plaintiff's past work, VE Dachelet testified that Plaintiff's previous work

24  as a certified nursing assistant, according to the Dictionary of Occupational Titles ("DOT"), is

25  medium with an specific vocational preparation ("SVP") of four, semiskilled.  AR 771.  The

26  childcare as an employee is light, with an SVP of four, semiskilled.  Childcare in a management

27  capacity is a light, skilled position; however, Plaintiff may have lifted in excess of 100 pounds,

28  thus performing the work at a heavy physical demand level.  AR 771-772.

1    VE Dachelet was asked to consider several hypothetical questions posed by the ALJ.

2    First, the VE was asked to assume a hypothetical worker of Plaintiff's age, education, and work

3    experience who is subject to two limitations: she can frequently handle, finger and feel; and can

4    perform simple, repetitive tasks.  AR 772.  VE Dachelet indicated the hypothetical worker could

5    not perform Plaintiff's past relevant work.  AR 772.

6    In a second hypothetical, the following additional limitations were to be considered: the

7    ability to stand and walk for a total of less than two hours in an eight-hour day; and ability to sit

8    for four hours in an eight-hour day.  AR 772-773.  The VE indicated the entire world of work

9    would be closed to such a worker.  AR 773.

10    In a third hypothetical, the VE was asked to assume a hypothetical worker of Plaintiff's

11    age, education, and work experience who must lie down, recline and elevate her feet at least two

12    or three hours in an eight-hour workday, VE Dachelet indicated the entire world of work would

13    be closed to such a worker.  AR 773.  Lastly, VE Dachelet indicated that his testimony was

14    consistent with the DOT.  AR 774.

15                    **Medical Record**

16    The entire medical record was reviewed by the Court.  Those records relevant to the

17    issues on appeal are summarized below.  Otherwise, the medical evidence will be referenced as

18    necessary in this Court's decision.

19                    ***Rustom F. Damania, M.D.***

20    On April 6, 2005, Plaintiff was seen by internist Dr. Damania. Plaintiff appeared for her

21    appointment in a motorized wheelchair, lying "in the right lateral position."  AR 601.  She

22    advised the doctor that a neurologist at University Medical Center provided the wheelchair, but

23    she never saw that physician again.  AR 601.

24    Plaintiff's chief complaints included the inability to sit up for prolonged periods of time

25    due to pain in the back, legs and neck.  She advised she had been told that she had a pinched

26    nerve of the cervical vertebrae, and that surgery was not recommended.  The pain was described

27    as constant and sharp, and as a result, she is unable to move.  AR 601.  Plaintiff complained of

28    pain in the mid thoracic and lumbar spine areas as well.  AR 601.  Lastly, Plaintiff complained of

spasms in her toes.  AR 602.  The doctor noted Plaintiff's history of a heart murmur, D & C, right wrist fracture in 1970 and fracture to the right metatarsal bones as the result of a motorcycle accident in the 1980's.  AR 602.

Plaintiff's social history indicates she stated she did some cooking and light chores; one of the children accompanying her to the appointment indicated Plaintiff needs assistance to dress and bathe.  AR 602.  Plaintiff did not indicate a history of any psychiatric impairment.  It is noted that "[s]he would not give any further details regarding her activities of daily living."  AR 602. Plaintiff was noted to be a well-built, well-nourished individual who was very respectful and answered questions, yet who "[d]oes not follow instructions."  AR 603.

Dr. Damania's physical examination revealed normal findings regarding Plaintiff's vital signs, skin, head and scalp, eyes, ears, nose and throat, thorax, lungs, heart, and abdomen.  AR 603.  Additionally, the doctor's physical examination revealed the following: normal joints in all upper and lower extremities, except for the right hip and shoulder joints as those could not be examined because Plaintiff refused to change her position to accommodate such an examination; flexion and extension in the cervical spine were normal; no deformities of the thoracic spine or lumbosacral spine were identified; and Plaintiff's gait was normal.  AR 604.  The lymphatic, vascular and neurological findings were also normal.  AR 604.

Dr. Damania diagnosed neck, back and hip pain without exact duration.  AR 604.  The doctor's assessment included a notation that "[t]here was no major objective evidence found for gross physical impairment.  It appears this may be psychological."  AR 605.

### *Madhav Suri, M.D.*

On July 5, 2005, board certified neurologist Madhav Suri examined Plaintiff at Dr. Marlyn C. Conanan's request.  Plaintiff identified her illness as a sharp pain to the head, radiating down the left neck and entire arm.  Occasionally, the pain occurs in the buttocks and radiates or shoots down the left leg.  Plaintiff also complained of widespread body tingling, headaches, and nausea.  Plaintiff reported that certain smells, like perfume, can trigger a "seizure."  She indicated she also suffered from a stiff neck with severe vomiting, memory loss and confusion, and headaches worsened by bright lights.  AR 608.

1    Dr. Suri's examination results reveal Plaintiff was in a wheelchair and "described [] body

2    shakes" and an inability to walk.  Normal findings were recorded following an examination of

3    Plaintiff's eyes, head, ears, nose and throat, neck, respiratory systems, heart, and skin.  AR 609.

4    A musculoskeletal examination notes no deformities, and no foot drop, edema or tenderness.

5    Plaintiff's spine was noted to be straight without scoliosis or other defect.  AR 609.  Dr. Suri

6    noted Plaintiff was alert, oriented to person, place and time, and displayed normal speech,

7    language and grammar usage.  AR 609.

8    A neurologic examination of the cranial nerves, and motor and sensory systems produced

9    normal results.  With regard to Plaintiff's gait, Dr. Suri noted that "she is able to get out of the

10   wheelchair and stand, but tends to shake considerably and wants to lay down.  She describes

11   herself as dizzy.  She was not able to walk.  Her stance was slightly wide-based.  She did not fall

12   to either side."  AR 610.

13   The doctor's impressions included the fact that there is little objective evidence to support

14   Plaintiff's complaints.  The doctor noted she displayed "several dopaminergic and serotonergic

15   symptoms suggestive of underlying anxiety depression . . .."  AR 610.  Dr. Suri did state that

16   Plaintiff "may also have an underlying median nerve entrapments at the wrists," in part because

17   her grip strength was markedly decreased bilaterally.  AR 610.  It was also noted that Plaintiff's

18   cooperation was limited and "[s]light voluntary resistance was noted."  AR 610.

19   Dr. Suri's recommendations included continued treatment of Plaintiff's migraines with

20   over the counter medications, avoiding repetitive strain injury to the wrists with use of a left wrist

21   splint provided, and a trial of the prescription medication Lexapro.  AR 610-611.

22                              ***Ekram Michiel, M.D.***

23   On September 17, 2005, board certified psychiatrist Ekram Michiel performed a

24   psychological evaluation.  Plaintiff stated she had been "depressed since 2001" following an

25   injury at work.  AR 616.  She indicated that she cannot sleep at night, is tired and dependent on

26   others.  Plaintiff angers easily, feels sad and cries.  She also feels useless and worthless.  AR 616.

27   Plaintiff had no history of past psychiatric issues or hospitalization. AR 616.  It was noted that

28

1   Plaintiff's activities of daily living include the ability to take care of her personal hygiene,

2   however, she is unable to shop, cook or do household chores.  AR 617.

3        Dr. Michiel's examination revealed Plaintiff was fairly groomed, with normal posture and

4   no involuntary movements or mannerisms present.  She kept fair eye contact and her speech was

5   normal.  AR 617.  She was oriented to person, place and date, and her abstract thinking was

6   normal, as were insight and judgment.  Her mood was depressed, affect was broad and

7   appropriate.  No suicidal or homicidal ideation was present.  AR 617.  Plaintiff's thought process

8   was goal-directed, thought content was not delusional and she did not suffer from auditory,

9   visual or tactile hallucinations or delusions.  AR 617.

10       The doctor's diagnosis included depressive disorder, not otherwise specified, with a

11  Global Assessment Functioning[3] ("GAF") score of 55 to 60.  Dr. Michiel believed Plaintiff was

12  able to maintain attention and concentration and could carry out one or two step simple job

13  instructions.  She was able to relate and interact with coworkers, supervisors and the general

14  public.  AR 618.

15                    *Mental Residual Functional Capacity Assessment*

16       Luyen T. Luu, M.D., completed a mental residual functional capacity ("RFC") assessment

17  in October 2005 and determined the following.  Plaintiff was not significantly limited in the

18  ability to remember locations and work-like procedures, nor in the ability to understand and

19  remember very short and simple instructions.  She was moderately limited in her ability to

20  understand and remember detailed instructions.  With regard to sustained concentration and

21  persistence, Plaintiff was moderately limited in only a single area, that is, the ability to carry out

22  detailed instructions.  The remaining areas were identified as not significantly limiting to

23  Plaintiff.  AR 619.  With regard to social interaction as a whole, Dr. Luu determined Plaintiff

24  was not significantly limited.  AR 620.  Additionally, the doctor found Plaintiff was not

25  significantly limited in the area of adaptation, meaning the ability to respond appropriately to

26

27       [3]The Global Assessment of Functioning or "GAF" scale reflects a clinician's assessment
    of the individual's overall level of functioning.  *American Psychiatric Association, Diagnostic &*
28  *Statistical Manual of Mental Disorders* 30 (4th ed. 2000) ("DSM IV").

                                                    9

1  changes in work setting, be aware of normal hazards and take precautions, the ability to travel to

2  unfamiliar places or use public transportation, or to set realistic goals and make plans

3  independently of others.  AR 620.

4      Dr. Luu also completed a Psychiatric Review Technique in October 2005.  The doctor

5  determined there was insufficient evidence to substantiate the presence of an organic mental,

6  schizophrenic or paranoid, anxiety-related, somatoform, personality, substance, or autistic

7  disorder.  AR 625-634.  The doctor determined an affective disorder of some type was present.

8  AR 628.  As a result, it was determined that there were mild restrictions to the activities of daily

9  living and maintaining concentration, persistence and pace.  Moderate limitation was identified

10  as to maintaining social functioning only.  AR 635.

11  **ALJ's Findings**

12      The ALJ determined that Plaintiff had not engaged in substantial gainful activity since

13  September 24, 2004, and had the severe impairments of adjustment disorder with depressed

14  mood, personality disorder, and median nerve entrapment at the wrists.  AR 21.  Nonetheless, the

15  ALJ determined that none of the severe impairments met or exceeded one of the listing

16  impairments.  AR 22.

17      Based on his review of the medical evidence, the ALJ determined that, Plaintiff had the

18  RFC to perform a full range of work at all exertional levels, limited to simple repetitive tasks,

19  with "only frequent[]" handling, fingering and feeling.  AR 22.  The ALJ found that Plaintiff

20  could not perform her past relevant work.  AR 24.  Nevertheless, the ALJ determined that

21  Plaintiff had the RFC to perform other jobs that exist in significant numbers in the national

22  economy.  AR 24-25.

23  **SCOPE OF REVIEW**

24      Congress has provided a limited scope of judicial review of the Commissioner's decision

25  to deny benefits under the Act.  In reviewing findings of fact with respect to such determinations,

26  the Court must determine whether the decision of the Commissioner is supported by substantial

27  evidence.  42 U.S.C. § 405(g).  Substantial evidence means "more than a mere scintilla,"

28  *Richardson v. Perales*, 402 U.S. 389, 402 (1971), but less than a preponderance.  *Sorenson v.*

*Weinberger*, 514 F.2d 1112, 1119, n. 10 (9th Cir. 1975).  It is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Richardson*, 402 U.S. at 401.  The record as a whole must be considered, weighing both the evidence that supports and the evidence that detracts from the Commissioner's conclusion.  *Jones v. Heckler,* 760 F.2d 993, 995 (9th Cir. 1985).  In weighing the evidence and making findings, the Commissioner must apply the proper legal standards.  *E.g.*, *Burkhart v. Bowen*, 856 F.2d 1335, 1338 (9th Cir. 1988).  This Court must uphold the Commissioner's determination that the claimant is not disabled if the Secretary applied the proper legal standards, and if the Commissioner's findings are supported by substantial evidence.  *See Sanchez v. Sec'y of Health and Human Serv.*, 812 F.2d 509, 510 (9th Cir. 1987).

## REVIEW

In order to qualify for benefits, a claimant must establish that she is unable to engage in substantial gainful activity due to a medically determinable physical or mental impairment which has lasted or can be expected to last for a continuous period of not less than twelve months.  42 U.S.C. § 1382c (a)(3)(A).  A claimant must show that she has a physical or mental impairment of such severity that she is not only unable to do her previous work, but cannot, considering her age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy.  *Quang Van Han v. Bowen*, 882 F.2d 1453, 1456 (9th Cir. 1989).  The burden is on the claimant to establish disability.  *Terry v. Sullivan*, 903 F.2d 1273, 1275 (9th Cir. 1990).

In an effort to achieve uniformity of decisions, the Commissioner has promulgated regulations which contain, inter alia, a five-step sequential disability evaluation process.  20 C.F.R. §§ 404.1520 (a)-(f), 416.920 (a)-(f) (1994).  Applying this process in this case, the ALJ found that Plaintiff: (1) had not engaged in substantial gainful activity since the alleged onset of her disability; (2) has an impairment or a combination of impairments that is considered "severe" based on the requirements in the Regulations (20 CFR §§ 416.920(b)); (3) does not have an impairment or combination of impairments which meets or equals one of the impairments set forth in Appendix 1, Subpart P, Regulations No. 4; (4) was unable to perform her past relevant

11

1  work; yet (5) retained the RFC to perform other jobs that exist in significant numbers in the

2  national economy.  AR 19-25.

3       Here, the Court construes Plaintiff's arguments to include a challenge to (1) the

4  sufficiency of the evidence, (2) the ALJ's use of a VE; and (3) the ALJ's consideration of the lay

5  testimony offered by Plaintiff's daughter.  (Doc. 26 at 2-3.)

6  **DISCUSSION**

7      **A.**    ***The ALJ's Findings are Supported by Substantial Evidence***

8       Plaintiff challenges the ALJ's findings that she is not disabled.  (Doc. 26.)  Defendant

9  counters that substantial evidence supports the ALJ's determination, and thus his finding of non-

10  disability is free of legal error.  (Doc. 32 at 8-11.)

11       A plaintiff bears the burden of proving that he or she is disabled.  *Meanel v. Apfel*, 172

12  F.3d 1111, 1114 (9th Cir. 1999); 20 C.F.R. § 404.1512.  The mere diagnosis of an impairment is

13  not sufficient to sustain a finding of disability.  *Key v. Heckler*, 754 F.2d 1545, 1549 (9th Cir.

14  1985); *see also Matthews v. Shalala*, 10 F.3d 678, 680 (9th Cir. 1993) (mere existence of

15  impairment is insufficient proof of disability).  Thus, although Plaintiff has been diagnosed with

16  impairments, those same diagnoses do not necessarily mean she is disabled.

17       Courts do not have the responsibility for weighing the evidence and resolving conflicts

18  therein; rather, that responsibility belongs to the Commissioner alone.  *Richardson v.  Perales*,

19  402 U.S. at 399.  The ALJ is responsible for resolving conflicts in the medical evidence.

20  *Magallanes v. Bowen*, 881 F.2d 747, 750 (9th Cir. 1989).  Indeed, the Court must uphold the

21  ALJ's decision where the evidence is susceptible to more than one rational interpretation.  *Id.*

22       ALJ Larsen found Plaintiff capable of a full range of work at all exertional levels, with a

23  limitation to simple, repetitive work and only frequent handling, fingering and feeling.  AR 22-

24  24.  The ALJ's determination was based on his consideration of the entire record, including the

25  objective medical evidence and opinion evidence.  AR 22.  More particularly, the ALJ's findings

26  state as follows:

27         Ms. Ogundimo appeared at the hearing in a wheelchair, although there is
       nothing in the record to establish any impairment requiring her to use one.  Like

28

Judge Birge, and like the state-agency medical consultants, I found difficulties with Ms. Ogundimo's credibility.

Ms. Ogundimo testified she has nausea and pain shooting in her back to her neck which causes her to have headaches. Allegedly the pain also travels to her legs and causes her to fall frequently (twice this month). She said she injured her back while working as a nurse. She has 6 children, and thought she could work at home[,] but discovered she could not sit in an upright chair, although she can sit in the wheelchair and pull it up to a desk. She admitted she can work at a computer, but claims 2[⁴] hours a week would be a lot for her. She also admitted she rarely uses the wheelchair - which she says a neurologist gave her in 2002 - when she is at home. Ms. Ogundimo also said she sees 2 or 3 doctors every 3 months. She said she did not go to the first consultative psychiatric examination because she got a letter indicating that she didn't need to go, but the state-agency medical consultants indicate she refused to attend.

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

After considering the evidence of record, I find Ms. Ogundimo's medically-determinable impairments can reasonably be expected to produce her alleged symptoms, but her statements about the intensity, persistence, and limiting effects of those symptoms are not credible to the extent that they are inconsistent with my assessment of her residual functional capacity, for the reasons explained below.

The scant medical record shows routine medication management for Ms. Ogundimo's numerous complaints of generalized body pain, headaches, and dizziness but contains no radiologic or other objective findings to establish a physical cause.

In his April, 2005, examination, consultative examiner Dr. R. Damania reported essentially normal findings, except that he was unable to test Ms. Ogundimo's hip joints or her right shoulder because she would not move once on the examining table [citation]. Dr. Damania found no objective evidence of any gross physical impairment, but suggested Ms. Ogundimo might have some psychological impairment. This observation was borne out when the consultative psychiatrist Dr. Michiel examined Ms. Ogundimo 5 months later. He diagnosed a depressive disorder and concluded Ms. Ogundimo could perform simple repetitive tasks; deal appropriately with the public, supervisors, and co-workers; and maintain attention and concentration for 2-hour periods.

However, in July, 2005, consulting neurologist Dr. Suri found a physical impairment. Even though he reported Ms. Ogundimo was uncooperative with his examination, he suggested she might have median bilateral nerve entrapment at the wrists. The state-agency medical consultants concluded otherwise, finding Ms. Ogundimo has no severe physical impairments and can perform simple repetitive tasks, but I give Ms. Ogundimo the benefit of the doubt on this point.

AR 23-24, internal citations omitted. An ALJ cannot be required to believe every allegation of

disabling pain. *Fair v. Bowen*, 885 F.2d 597, 601 (9th Cir. 1989), citing *Magallanes v. Bowen*,

881 F.2d at 755. Here, the ALJ explained why he did not accept Ms. Ogundimo's entire

testimony regarding her disabling pain. "Where [] medical reports are inconclusive, 'questions

⁴The Court believes this is a typographical error, as it is clear from Plaintiff's testimony that she referenced twenty or "20" hours per week. *See* AR 752.

13

1  of credibility and resolution of conflicts in the testimony are functions solely of the Secretary.'"

2  *Sample v. Schweiker*, 694 F.2d 639, 642 (9th Cir. 1982).

3        The reports of both Dr. Damania and Dr. Suri note the lack of objective medical evidence

4  to support Plaintiff's allegations.  *See* AR 605 ["no objective evidence"] & 610 ["little objective

5  evidence"].  In this case then, there is "more than a mere scintilla" that Plaintiff retains the ability

6  to perform some work in the national economy.  *Richardson v. Perales*, 402 U.S. at 402.

7        With specific regard to Plaintiff's use of a wheelchair, Defendant is correct:  there is no

8  objective evidence in the record that a physician ordered or prescribed a wheelchair for Plaintiff's

9  use.  Despite Plaintiff's own statements to the contrary - that a Dr. Felmus ordered the wheelchair

10  - the statements are simply not supported by the medical record.  Plaintiff points to the evaluation

11  performed by Dakota Sports Physical Therapist Erik P. Waterland in support of her argument.

12  The ALJ did in fact consider this evaluation, despite the fact that a therapist is not an acceptable

13  medical source for purposes of this matter.  "Medical sources who are not 'acceptable medical

14  sources,' such as nurse practitioners, physician assistants, licensed clinical social workers,

15  naturopaths, chiropractors, audiologists, and therapists . . .."  *See* SSR 06-03p.  Moreover, the

16  Dakota Sports evaluation merely references Plaintiff's use of a wheelchair.  It is not evidence that

17  the wheelchair was prescribed by a physician or other accepted medical source.  In sum, this

18  Court finds the ALJ's findings are reasonable and are supported by substantial evidence.

19  Therefore, this Court must uphold the decision.  *Magallanes v. Bowen*, 881 F.2d 747.

20        **B.**    ***The ALJ's Duties and the Testimony of the VE***

21        In her opening brief, Plaintiff asserts the ALJ erred by violating her due process rights in

22  accordance with Title 20 of the Code of Federal Regulations section 404.1620 (a) and (b) where

23  "the ALJ allowed a vocational expert to testify but failed to allow subpoena testimony" from her

24  care providers.  She claims the "testimony of all treating physicians is needed to make an unbias

25  [*sic*] ACCURATE decision."  (Doc. 26 at 2, emphasis in original.)  Defendant argues the

26  regulation does not apply to ALJs or the Appeals Council.  (Doc. 32 at 10.)

27

28

1

### 1.    The ALJ's Duty

2

The relevant regulation provides as follows:

3

        (a) The State will provide the organizational structure, qualified personnel,
medical consultant services, and a quality assurance function sufficient to ensure
4      that disability determinations are made accurately and promptly. We may impose
specific administrative requirements in these areas and in those under
5      "Administrative Responsibilities and Requirements" in order to establish uniform,
national administrative practices or to correct the areas of deficiencies which may
6      later cause the State to be substantially failing to comply with our regulations or
other written guidelines. We will notify the State, in writing, of the administrative
7      requirements being imposed and of any administrative deficiencies it is required
to correct. We will allow the State 90 days from the date of this notice to make
8      appropriate corrections. Once corrected, we will monitor the State's administrative
practices for 180 days. If the State does not meet the requirements or correct all of
9      the deficiencies, or, if some of the deficiencies recur, we may initiate procedures
to determine if the State is substantially failing to follow our regulations or other
10     written guidelines.
        (b) The State is responsible for making accurate and prompt disability
11     determinations.

12

20 C.F.R. § 404.1620.  The ALJ did not err because this regulation does not require an ALJ to

13

subpoena Plaintiff's physicians to testify at the administrative hearing.

14

        When the evidence is ambiguous or "the record is inadequate" to allow for proper

15

evaluation of the evidence, the ALJ has a duty to develop the record.  *Tonapetyan v. Halter*, 242

16

F.3d 1144, 1150 (9th Cir. 2001).  The ALJ may discharge this duty in one of several ways,

17

including subpoenaing claimant's doctors, submitting questions to claimant's physicians,

18

continuing the hearing, or keeping the record open after the hearing to allow supplementation of

19

the record.  *Id.*  Here however, the evidence was not ambiguous and thus the ALJ was not

20

required to develop the record further, by way of contacting Plaintiff's physicians.

21

        Furthermore, this Court notes that Plaintiff was advised in a letter dated June 30, 2008,

22

sent in anticipation of the administrative hearing proceedings, that if she wanted the ALJ to issue

23

a subpoena, she was required to "submit a written request" as soon as possible prior to the

24

hearing.  "The request must identify the needed documents or witnesses and their location, state

25

the important facts the document or witness is expected to prove, and indicate why [the claimant]

26

cannot prove these facts without a subpoena."  *See* AR 28.  No written request appears in the

27

record before this Court.

28

1          **2.     Testimony of the VE**

2          The ALJ's reliance upon the testimony of a VE was proper. In general, where a claimant

3    suffers only from exertional limitations, the ALJ may apply the Grids at step five to match the

4    claimant with the appropriate work. *Reddick v. Chater*, 157 F.3d 715, 729 (9th Cir. 1998).  The

5    ALJ may apply the Grids in lieu of taking VE testimony only when the Grids accurately and

6    completely describe the claimant's abilities and limitations.  Id.,

7    citing *Jones v. Heckler*, 760 F.2d 993, 995 (9th Cir. 1985).  If a claimant's non-exertional

8    limitations "significantly limit the range of work" he can perform, mechanical application of the

9    Grids is inappropriate and a VE would be needed to describe what, if any, jobs existed in the

10   national economy that the claimant could perform. *Desrosiers v. Secretary of Housing and*

11   *Health Services*, 846 F.2d 573, 577 (9th Cir. 1988).  The determination of whether a non-

12   exertional limitation significantly limits the range of work the claimant is able to perform is left

13   to the ALJ. *Id.*

14         "Non-exertional limitations are limitations that do not directly affect a claimant's

15   strength." *Burkhart,* 856 F.2d at 1340; 20 C.F.R. § 416.969a (1997).  Disabling pain is

16   considered a non-exertional limitation. *Penny v. Sullivan*, 2 F.3d 953, 959 (9th Cir. 1993).  Once

17   a non-exertional limitation is found, if it is significantly disabling and affects plaintiff's ability to

18   complete work listed in the grids, reliance on the grids would be inappropriate and a vocational

19   expert should be used. *Desrosiers v. Secretary of Housing and Health Services*, 846 F.2d 573,

20   577 (9th Cir. 1988).

21         Here, because non-exertional limitations applicable to Plaintiff would significantly limit

22   the range of work she could perform, the ALJ was required to obtain the testimony of a VE.

23   Thus, no error occurred.

24         **C.     *Fatima Ogundimo's Testimony***

25         Plaintiff's opening brief references her daughter Fatima's testimony that Plaintiff uses a

26   wheelchair whenever she goes out and that her "daughter & siblings [do] all chores a[nd] any

27   chores that the Claimant does she has to rest often afterwards from exhaustion . . .." (Doc. 26 at

28

16

2.)  The Commissioner acknowledges Fatima's testimony "that Plaintiff engaged in some household activities."  (Doc. 32 at 8-9.)

Specifically, the ALJ found as follows:

> Fatima Ogundimo testified her mother can walk about 5 minutes and can stand for cooking, but has to rest a long time after that.  She said she began using the wheelchair approximately in 2002 and always uses it when she leaves the house.  According to Fatima, her mother cleans the bathrooms, cleans and mops the dining room, does the laundry, and occasionally vacuums; once a month she cleans the cabinets, walks to the store 3 times a week, and rides the bus to pay the bills.

AR 23.

On this record, the ALJ misunderstood Fatima's testimony at the hearing.  Fatima in fact testified that she and her siblings clean the bathroom, kitchen, bedrooms, sweep and mop the dining room, clean the walls, cabinets and baseboards, and do the laundry.  Additionally, the children will run errands, do the grocery shopping and use the bus to pay the family's bills.  AR 769-770.  Notwithstanding the above, the Court finds that this error was harmless because the ALJ gave a number of other reasons for his credibility determination which are supported by substantial evidence.  *Batson v. Barnhart*, 359 F.3d 1190, 1197 (9th Cir. 2004) (upholding ALJ's credibility determination even though one reason may have been in error); *Carmickle v. Commissioner of Social Sec. Admin.*, 533 F.3d at 1162, citing *Batson v. Comm. of Soc. Sec. Admin.*, 359 F. 3d 1190, 1197) ("So long as there remains 'substantial evidence supporting the ALJ's conclusions on . . . credibility' and the error 'does not negate the validity of the ALJ's ultimate [credibility] conclusion' such is deemed harmless and does not warrant reversal").  In this case, the ALJ expressly noted that the "scant medical record" and lack of objective evidence affected his credibility analysis.  AR 23-24. Because the ALJ's credibility determination did not rest solely on Fatima Ogundimo's testimony, the fact the ALJ misunderstood her testimony is harmless.  Therefore, there is no reason to disturb the ALJ's determination.

//

//

//

//

**D.** *Miscellaneous*

This Court notes that in her reply to the Defendant's opposition, Plaintiff alleges various doctors were "lying" or "misdiagnosed" her.  AR 37.  Plaintiff's allegations are not supported by the record.  There is absolutely no evidence the doctors acted inappropriately, and this Court rejects Plaintiff's argument as mere speculation.

## CONCLUSION

Based on the foregoing, the Court finds that the ALJ's decision is supported by substantial evidence in the record as a whole and is based on proper legal standards.  Accordingly, this Court DENIES Plaintiff's appeal from the administrative decision of the Commissioner of Social Security.  The Clerk of this Court is DIRECTED to enter judgment in favor of Defendant Michael J. Astrue, Commissioner of Social Security and against Plaintiff, Carlotta Ogundimo.


IT IS SO ORDERED.

**Dated:   September 26, 2010**            /s/ **Gary S. Austin**
                              UNITED STATES MAGISTRATE JUDGE